1
2
3
4
5
6
7

8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10            **EASTERN DIVISION**

11 **KELLY STODDARD,**                    )
                                          )
12                   **Plaintiff,**        )        **Case  No. EDCV 08-00994 AJW**
                                          )
13            **v.**                       )        **MEMORANDUM OF DECISION**
                                          )
14 **MICHAEL J. ASTRUE,**                  )
   **Commissioner of the Social**          )
15 **Security Administration,**            )
                                          )
16                   **Defendant.**        )
   _____)

17

18          Plaintiff filed this action seeking reversal of the decision of the defendant, the Commissioner of the

19 Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance

20 benefits and supplemental security ("SSI") income benefits. The parties have filed a Joint Stipulation ("JS")

21 setting forth their contentions with respect to each disputed issue.

22                          **Administrative Proceedings**

23          Plaintiff filed applications for disability insurance benefits and SSI benefits on April 3, 2002,

24 alleging that she had been disabled since November 16, 1996 due to impairments consisting of herniated

25 discs, constant headaches, and pain.   [Administrative Record ("AR") 16, 69-70, 176].   Plaintiff's

26 applications were denied initially and upon reconsideration. [JS 2; AR 79-87, 93-97].   Administrative

27 hearings were conducted by an Administrative Law Judge (the "ALJ") on January 15, 2005 and on March

28

1    8, 2005.[1]  [AR 16, 65, 834-859].  Plaintiff was not represented during the first hearing, but she had counsel

2    during the second hearing.  She testified on her own behalf during both hearings. [AR 16, 67, 836-844].

3    Testimony also was received from Dr. Joseph Malancharuvil, a medical expert, and from Sandra Fioretti,

4    a vocational expert. [AR 16, 845-846, 850-858].

5        On July 15, 2005, the ALJ issued a written decision denying plaintiff's applications for benefits.

6    [AR 65-78]. The Appeals Council granted plaintiff's request for review, vacated the ALJ's decision, and

7    remanded the case for further proceedings. [AR 17, 157-160].  Additional administrative hearings were held

8    on July 25, 2006, September 27, 2006, and January 26, 2007.  [AR 812-832, 793-797, 801-809].  During

9    the July 25, 2006 hearing, testimony was received from Dr. Malancharuvil and Stephen Berry, a vocational

10   expert. [AR 812-832].  Plaintiff, who was represented by counsel, testified during the September 27, 2006

11   hearing.  [AR 791-797].  Plaintiff and her attorney were present during the January 26, 2007 hearing, but

12   the only testimony taken was that of Corinne Porter, a vocational expert.  [AR 798-809].

13       In a written decision dated March 21, 2007 that constitutes the final decision of the Commissioner

14   in this case, the ALJ denied plaintiff's applications for benefits.  [AR 16-27].  The ALJ found that plaintiff

15   had the following severe impairments: degenerative disc disease, polysubstance abuse, substance induced

16   mood disorder, and a mixed personality disorder with borderline and anti-social features.  [AR 20].  The

17   ALJ determined that plaintiff's impairments, singly or in combination, met the listing criteria for disability

18   based on organic mental disorders.  [AR 25].  See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02C.

19   The ALJ further found that if plaintiff stopped using drugs and alcohol, she would continue to have severe

20   impairments consisting of degenerative disc disease, a mood disorder, and a mixed personality disorder with

21   borderline and anti-social features. [AR 25].  The ALJ determined that if plaintiff stopped her substance

22   abuse, she would retain the residual functional capacity ("RFC") to

23       lift and carry 20 pounds occasionally and 10 pounds frequently.  She could stand and walk

---

24   [1]    The record contains no transcript of the January 15, 2005 hearing.  Plaintiff testified during
25   that hearing.  She was not represented by counsel.  During the hearing in March 2005, plaintiff was
     represented by the attorney who is her counsel of record in this case. [AR 835-836]. The ALJ asked
26   counsel whether he had listened to the tape of the prior hearing.  Counsel replied, "I'm going to
     waive that, Your Honor."  [AR 836].  The ALJ responded that he was "going to review [plaintiff's]
27   testimony" from that hearing, "to make sure things haven't changed from that date."  [AR 836].
     There is no suggestion in the record before the Court that omission of the January 2005 hearing
28   transcript prejudices plaintiff, and neither party has raised the issue.

for 2 hours out of an 8-hour work day, and she could sit for 6 hours out of an 8-hour work day with 15-minute breaks every two hours.  She could occasionally stoop and bend.  She could climb stairs but not ladders. She could not perform work at heights or perform balancing.  She could perform simple, repetitive tasks consisting of 3-4 step instructions in a non-public setting.  She could have occasional superficial interaction with the public.  She could have normal interaction with supervisors and co-workers.  She could not perform work requiring hyper-vigilance, safety operations, or fast paced work such as rapid assembly lines. She could not work with hazardous or fast-moving machinery, and she could not [do] work involving driving.  She cannot work around fast moving belts, but a slow moving assembly line is permissible.

[AR 25].

At step four of the sequential evaluation, the ALJ found that plaintiff's RFC precluded performance of her past relevant work.  [AR 25-26].  Based on the vocational expert's testimony and Rules 202.21 and 202.14 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ determined that if plaintiff stopped her substance abuse, she could perform alternative jobs that exist in significant numbers in the national economy. [AR 26-27].  The ALJ therefore concluded that plaintiff was not disabled at any time up to the date of his decision.  The Appeals Council denied plaintiff's request for review.  [AR 6-8].

**Factual Background**

Plaintiff was born in 1956, and she was 50 years old when the ALJ issued his decision. [AR 26]. Plaintiff has a high school education and is able to communicate in English. [JS 2; AR 26].  Plaintiff has worked as a temporary office worker, auto sales person, and bartender.  [AR 26].  Plaintiff last worked in 1999. [AR 228, 795].  Plaintiff testified that her mother had been supporting her "for years and that's been a big problem." [AR 842].  Plaintiff said that after she stopped working in 2000, she was "totally" supported by her mother until February 2006, when her mother "sold the home that she owned that I was living in." [AR 795-795].  Since that time, plaintiff had been homeless, "staying at friends' places and wherever I can, basically." [AR 796].  Plaintiff also testified that she tries to go to church regularly.  [AR 795]. She said that she drank "once in a while," and that she had not used "speed" since around November

2004. [AR 794, 795, 839]. Plaintiff had taken narcotic pain medication. [AR 848-849]. Plaintiff testified that she was not presently taking any psychiatric medication other than Ritalin for attention deficit disorder. [AR 839, 843-844].

Plaintiff testified that she had tried rehabilitation programs in the past.  She said that was she was not attending Alcoholics Anonymous or Narcotics Anonymous meetings. She said that she read books that she got from a treatment center she had gone to before to stay focused and on track. [AR 795].  She said that she had not looked for a job and could not work because "I'm pretty depressed.  I have a hard time getting out of bed.  And, I have a real problem with time management.  And depending on how my day starts out with pain, it takes me sometimes two hours[s] for me to get ready."  [AR 842].  She said that she was easily distracted despite taking Ritalin. [AR 842, 844].

Plaintiff has a long  history of alcohol and drug abuse.  At the age of 12, plaintiff began drinking, and she started using drugs at the age of 18.  [AR 23, 632].  Plaintiff was hospitalized in August 1996 for methamphetamine and alcohol abuse.  [AR 24, 429-430].  While treating plaintiff for back pain in February 1998, Dr. S. Shah reported that plaintiff was using "alcohol and any medications she can get her hands on." [AR 24, 513].  One month later, plaintiff was hospitalized with a "probabl[e] dual diagnosis of both a mood disorder and chemical dependency" after the police brought her to the hospital for "apparently causing a disturbance" at a hotel. [AR 24, 426-428].  When taken to the hospital after a subsequent truck accident in April 1998, plaintiff tested positive for amphetamine.  [AR 24, 445, 460].

Plaintiff went to Eisenhower Medical Center on July 3, 2001 seeking morphine for back pain, and the examining doctor suspected that she was drug seeking.  [AR 24, 550].  When she went back to Eisenhower Medical Center in September 2001, plaintiff said that no medication was helping her back pain, so she drank to alleviate the pain.  [AR 24, 547].

During her consultative psychiatric examination with Dr. Kent Jordan in February 2003, plaintiff said that she had been drinking the day before the examination. She said that she had used cocaine from the age of 18 to 26.  She began a methamphetamine habit at age 36 and continued to use that drug at age 46.  [AR 24, 692, 694]. Dr. Jordan reported that plaintiff acknowledged that "both alcohol and amphetamines are problems and she very much would like to stop." [AR 694].  She reported three psychiatric hospitalizations, each one a "72-hour hold for bizarre behavior," with no outpatient treatment.

4

Plaintiff attended the Betty Ford Center at age 28, and she

> also was in a drug and alcohol rehab 10 years ago. The rehab programs have been of no
> benefit to her and she has continued to drink. She also goes to AA daily, but continues to
> drink and use. The claimant cried when relating the fact that AA and her rehabs have been
> of no benefit and that she is continuing to drink and use.

[AR 692].

On mental status examination, plaintiff exhibited notably erratic or rapid speech rhythm, anxiety, and overall labile affect. Her cognitive function, orientation, and memory were intact. She could not do serial sevens, but "other concentration tasks were done quickly and correctly," with "no evidence overall of significant concentration impairment." Insight, judgment, and abstract thinking were not impaired. [AR 693].

Dr. Jordan 's diagnoses were (1) alcohol abuse, ongoing; (2) amphetamine abuse, ongoing; (3) cocaine abuse, in remission; (4) polysubstance-induced mood disorder with anxiety, labile mood, and depression; and (5) amphetamine-induced psychotic-like behavior, in remission. [AR 684]. He opined that if plaintiff "could remain clean and sober for a length of time, it is anticipated that her work interactions would be appropriate and she would be able to handle stress well and be able to follow instructions." [AR 694].

Plaintiff saw Charles Strole, a marriage and family therapist, for therapy from July 2003 until February 2005. [715-718]. Mr. Strole noted that plaintiff been "in and out of" treatment for substance abuse. He listed 21 prescription medications that plaintiff had taken within the past three years. [AR 716]. He gave plaintiff nine psychiatric diagnoses. [AR 717]. He also stated that plaintiff was noncompliant with treatment. [AR 717]. He commented that plaintiff's "use of prescription medications, constant paranoia, and refusal to ever acknowledge or take responsibility for her own behavior exacerabate[] treatment management." [AR 717]. Mr. Strole opined that plaintiff was totally disabled due to mental disorders. He remarked that plaintiff could benefit from a "comprehensive treatment program" but was "unlikely to admit herself voluntarily even though her mother has offered to pay for in-patient treatment." [AR 718].

The medical expert, Dr. Malancharuvil, testified that plaintiff was addicted to alcohol and drugs,

5

and that there was no medical evidence demonstrating that she had been sober for at least three to six months, the period required to "completely detoxify" and allow the brain to "readjust" in order to accurately assess her level of functioning when abstaining. [AR 817, 826, 850-853]. Dr. Malancharuvil testified that when using drugs and alcohol, plaintiff met the listing criteria for organic mental disorder with substance induced mood disorder, a mixed personality disorder with borderline and antisocial features, and a substance addiction disorder. [AR 817-819, 846, 851]. Dr. Malancharuvil added that plaintiff's personality disorder was present independent of her drug and alcohol use, but was "substantially aggravated when she's abusing drugs or alcohol." [AR 824].

Dr. Malancharuvil opined that when plaintiff was not using amphetamines or alcohol, she would not meet or equal any listing, explaining that "[t]here is no evidence that this lady is dysfunctional apart from the alcohol and the drug abuse. Another complicating factor in this is [that] she's noncompliant with treatment." [AR 820]. Dr. Malancharuvil testified that plaintiff could definitely perform "simple, repetitive tasks" of up to "three to four steps, easily," and that she "may be capable of functioning at a higher level, with moderately complex tasks." [AR 820; see AR 851]. He opined that plaintiff could not perform tasks requiring hypervigilance, safety operations, or fast-paced work, such as rapid assembly lines. [AR 852].

Plaintiff had a history of back problems. She incurred a work-related back injury in October 1988, and she had a diagnosis of herniated discs. In a workers' compensation "permanent and stationary" report dated April 1, 1996, Dr. George Watkin, an agreed medical examiner, opined that plaintiff was precluded from "heavy work." [AR 25, 607-618]. On March 24, 1998, Dr. John Thompson, a neurologist to whom plaintiff had been referred by Dr. Ronald Portnoff, her treating orthopedist, noted that plaintiff had a normal neurological examination and "minor" degenerative disc changes at the L4-5 and L5-S1 level. [AR 436]. Dr. Thompson "suggest[ed] that she wear a brace for a while and probably take Extra-Strength Tylenol for her pain." [AR 71, 436].

Dr. Watkin reexamined plaintiff on September 5, 2000. He did not change her permanent and stationary rating, but he recommended that plaintiff not return to work as a waitress. [AR 23, 604]. Plaintiff saw Dr. Michael Milligan for treatment of eczema on February 12, 2003 and reported that she showered two to three times a day. [AR 22, 749]. Plaintiff was treated by Dr. C. Edward Anderson, a

pain specialist, for back pain from October 1, 2002 to March 23, 2004. [AR 22, 733-742]. Although Dr. Anderson also gave plaintiff a diagnosis of attention deficit disorder, he did not treat plaintiff for that condition, and referred plaintiff to her mental health provider when she asked him for medication for "panic problems." [AR 733]. Dr. Anderson noted that plaintiff "fe[lt] that she does not need much pain medication," and had used a "minimal amount" of the medication that she had been prescribed for pain. [AR 733, 735]. Dr. Rick Foster, a chiropractor, treated plaintiff for pain in the neck and back and headaches from January 2002 through October 2004.  [AR 22, 662-672, 790].

During the March 2005 hearing, the ALJ summarized the testimony of Dr. Landau from the January 2005 hearing. [AR 837].  He said that Dr. Landau testified that plaintiff had disc disease of the lumbar spine. Dr. Landau opined that during an eight-hour work day, plaintiff could stand and walk for two hours and sit for six, with a 15-minute break every two hours. Dr. Landau also said that plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally, occasionally stoop and bend, climb stairs but not ladders, not work at heights or balance.  [AR 837].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error.  Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision.  Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of  Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

## Statement of Disputed Issues

The disputed issues are whether the ALJ (1) complied with the Appeals Council's remand order

to properly consider the examining physician's opinion; (2) complied with the Appeals Council's remand order to properly consider the lay witness testimony of plaintiff's mother; (3) properly considered the treating therapist's opinion; (4) properly considered the severity of plaintiff's mental impairment; and (5) posed a complete hypothetical question to the vocational expert.  [JS 3].

## Discussion

### Substance abuse as a contributing factor material to the determination of disability

A claimant who otherwise meets the definition of disability under the Social Security Act is not eligible to receive disability benefits if drug addiction or alcoholism is a "contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a).  If the Commissioner finds that the claimant is disabled and has medical evidence of the claimant's drug addiction or alcoholism, the Commissioner must determine if the claimant would still be disabled if he or she stopped using drugs or alcohol.  20 C.F.R. §§ 404.1535(b), 416.935(b); Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007), cert. denied, 128 S.Ct. 1068 (2008).   If a claimant would still be disabled if he or she stopped using drugs or alcohol, the claimant's drug or alcohol addiction is not a contributing factor material to the determination of disability, and benefits may be awarded.  20 C.F.R. §§ 404.1535(b), 416.935(b).

A two-step analysis is required to determine whether substance abuse is a material contributing factor.  The ALJ first must determine which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol, and then must determine whether the remaining limitations would be disabling.  If the remaining limitations are disabling, then the claimant's drug addiction or alcoholism is not a material factor to the determination of disability. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2); Parra, 481 F.3d at 747.

The claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material the disability determination, by showing that he or she would have remained disabled if the substance abuse ceased.  Parra, 481 F.3d at 748. Where the evidence of materiality is inconclusive, the claimant's burden of proof is not satisfied.  Parra, 481 F.3d at 749-750 (rejecting the argument that a finding of materiality is precluded unless the medical evidence affirmatively shows that a disability will resolve with abstinence). To hold otherwise would give an addicted claimant "no incentive to stop" abusing drugs or alcohol, "because abstinence may resolve his disabling limitations and cause his claim

to be rejected or his benefits terminated." Parra, 481 F.3d at 750.

**The ALJ's compliance with the Appeals Council's remand order**

Plaintiff contends that the ALJ erred in failing to comply with the Appeals Council's remand order concerning the evaluation of the opinion of Dr. Bedrin, an examining physician, and the testimony of plaintiff's mother.  [See JS 3-10].

After the Appeals Council vacated the July 2005 hearing decision and remanded the matter for further administrative proceedings [AR 17, 157-160], the ALJ issued a new hearing decision in March 2007.  The Appeals Council denied plaintiff's request for review of that decision.  [AR 6-8].

Where, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner, and only that decision is subject to judicial review.  See 20 C.F.R. §§ 404.967, 404.970, 404.979, 404.981, 416.1467, 416.1470, 416.1479, 416.1481; see generally 42 U.S.C. § 405(g); Califano v. Sanders, 430 U.S. 99, 108 (1977).   The issues before the court are whether the ALJ's final decision is supported by substantial evidence and is free of legal error, see Stout, 454 F.3d at 1054, not whether the ALJ complied with the Appeals Council's remand order.  In this case, moreover, the Appeals Council denied review of the ALJ's March 2007 hearing decision, explaining that it "found no reason under [its] rules to review" the ALJ's decision.  [AR 6].   Accordingly, there is no merit to plaintiff's argument that the ALJ erred in failing to comply with the Appeals Council's remand order.

**Examining physician's opinion**

Plaintiff's also argues, albeit in a cursory manner, that the ALJ committed legal error in evaluating the opinion of Dr. Bedrin, an examining physician. [JS 4].

A controverted examining physician's opinion may be rejected for specific and legitimate reasons based on substantial evidence in the record.  Batson v. Comm'r of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

Dr. Bedrin performed a complete psychiatric evaluation at the Commissioner's request on June 12, 2002. [AR 630-635].  He took a history, reviewed medical records, and conducted a mental status examination. Plaintiff said that she had been depressed for a year, that her depressive symptoms came and went, and that she felt depressed one or two days a week, on average.  [AR 630].  Plaintiff also said that

she was depressed because she did not have a job or a significant other, had a bad back, was in pain, and was supposed to have surgery.   [AR 630].  She complained of sleep problems and low energy, but her appetite was good. She participated in fewer activities and socializing than she used to because "she is embarrassed because people ask why she is not working." [AR 631]. She reported having been psychiatrically hospitalized three times.  She said that she drank alcohol two or three times a week.  She admitted using speed, marijuana, and cocaine from the age of 18 until two and a half years earlier. [AR 632].

 Plaintiff told Dr. Bedrin that she lived alone with her cat. She exhibited adequate grooming and hygiene.  She said that she went shopping for groceries, cooked her own meals, and drove a car. [AR 633-634].  A usual day entailed sleeping, watching television, trying to do housework, and listening to music. She said that she tried to attend church two or three times a month. Her hobbies were gardening and painting, but she had not done either in the past month and a half because she had lost interest. She also said, however, that she "will do art projects and right now am painting toilet seats.  I know this sounds weird but it's pretty cool." [AR 634]. She reported having few friends at present or during the previous five years because she "got rid of all [her] 'using' friends." [AR 634].

On mental status examination, plaintiff did not appear depressed or anxious. Her affect was constricted.  She had no suicidal or homicidal ideation. Her speech was fluent and without pressure. [AR 633].  Plaintiff was fully oriented and exhibited no psychotic symptoms, psychomotor retardation, or psychomotor excitability.  Her memory, both recent and remote, was intact. [AR 633].  Immediate recall was intact.  Her intelligence appeared to be in the average range. She could perform calculations. She lost concentration performing "serial sevens" (counting backward from 100 in increments of seven). [AR 633]. Plaintiff identified abstractions. Her judgment and insight were "fair to good."  [AR 633].

Dr. Bedrin diagnosed plaintiff with "Major depressive disorder recurrent by history. Past history of amphetamine abuse currently in remission, past history of cannabis abuse currently in remission, past history of cocaine abuse, currently in remission."  [AR 634].  Functionally, Dr. Bedrin opined that plaintiff was "competent with no impairment except for complex instructions," explaining that "[c]arrying out complex job instructions may be impaired secondary to impaired immediate recall." [AR 634]. However, he also opined that plaintiff had "no difficulty understanding and remembering." [AR 634].

Dr. Bedrin suggested that plaintiff "may have impairment secondary to concentration problems," but he also said that she "does not appear to have impairment in the ability to maintain concentration and attention." [AR 634]. He concluded that plaintiff was not impaired in her ability to interact with coworkers, supervisors, and the public, or to withstand the stresses and pressures associated with an eight-hour work day and regular work activities. [AR 634]. Dr. Bedrin opined that plaintiff could follow simple one- and two-step job instructions. [AR 634].

The final decision that is subject to judicial review in this case is the ALJ's March 2007 decision. In that decision, the ALJ discussed Dr. Bedrin's opinion. [AR 22-24]. The ALJ acknowledged that "Dr. Bedrin indicated that the claimant might have difficulty performing complex job instructions based on immediate recall," and that plaintiff "had problems performing serial sevens during Dr. Bedrin's examination." [AR 24]. However, the ALJ also pointed out that in his mental status examination report, Dr. Bedrin found that plaintiff's immediate recall, recent memory, and remote memory all were intact. [AR 24, 633-634]. Given this inconsistency, the ALJ reasonably inferred that plaintiff had a somewhat greater ability to perform complex tasks than indicated by Dr. Bedrin's narrative assessment alone.

Additionally, the ALJ noted that the medical expert, Dr. Malancharuvil, testified that if she was abstaining from drugs and alcohol, plaintiff "definitely" could perform simple, repetitive work of three to four steps in a nonpublic setting, as Dr. Bedrin concluded, and "probably" could handle "moderately complex tasks." [AR 820-821].

Commenting on other medical reports indicating that plaintiff was noncompliant with treatment, the ALJ remarked that such evidence was "consistent with Dr. Bedrin's findings." [AR 21-22]. Dr. Bedrin reported that plaintiff told him that she had seen a counselor "last year for five sessions" but was not receiving any mental health treatment for her allegedly disabling depression. [AR 631].

Considering Dr. Bedrin's findings and conclusions as a whole, along with Dr. Malancharuvil's testimony, the ALJ reasonably inferred that plaintiff was not precluded from performing "simple, repetitive tasks consisting of 3-4 step instructions." [AR 24]. Dr. Bedrin's opinion otherwise is consistent with the ALJ's RFC assessment. The remaining limitations assessed by the ALJ were based on substantial evidence in the form of Dr. Malancharuvil's testimony and consistent treating and examining source reports.

Accordingly, there was no error in the ALJ's evaluation of Dr. Bedrin's report, and the ALJ's RFC finding is supported by substantial evidence in the record as a whole.

### Lay witness testimony

Plaintiff contends that the ALJ improperly disregarded the lay testimony of plaintiff's mother, Ms. Flock.  [JS 7].

The ALJ must take into account lay witness testimony as to a claimant's symptoms and provide reasons that are germane to the witness for rejecting such testimony.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  Descriptions of family members in a position to observe a claimant's symptoms and daily activities are competent evidence and must be considered in determining how an impairment affects a claimant's ability to work. 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4); Smolen v. Chater, 80 F.3d 1273, 1288-89 (9th Cir. 1996); Dodrill v. Shalala, 12 F.3d 915, 918-919 (9th Cir. 1993); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).

In a daily activities questionnaire completed in April 2002, Ms. Flock testified that plaintiff was not very productive during the day and is disorganized despite not working.  [AR 240].  Ms. Flock acknowledged that plaintiff's grooming habits are fine, and that plaintiff prepares her own meals.  [AR 241].  In response to a question asking who paid plaintiff's bills, Ms. Flock said, "I pay for absolutely everything – all utilities, mortgage, medical bills.  I cannot do this much longer – I am retired on a fixed income and this is much too difficult for me."[2]  [AR 242].  Asked if plaintiff needed assistance to go out, Ms. Flock said that plaintiff needs "just a kick in the pants to get her butt moving."  [AR 242].  According to Ms. Flock, plaintiff starts projects that she never finishes, and can be very annoying and argumentative.  [AR 242-243].  Ms. Flock noted that plaintiff used to be very fun-loving and busy, but had become moody and unfriendly.[AR 244].  She remarked that plaintiff never stayed on medication long enough to see if it worked.  [AR 245].

---

[2]  Ms. Flock also submitted a letter in February 2004 saying that plaintiff had been completely dependent on her for four years, that she had subsidized plaintiff's living expenses since 1993, and that plaintiff had "worked periodically but has not earned enough to pay her own way." [AR 343]. Ms. Flock added that she needed to sell the condominium she had purchased for plaintiff to live in because "I am no longer financially able to support my daughter in any way.  My financial circumstances have changed drastically and I am retired with no earned income." [AR 343]. A summary of medical expenses submitted by Ms. Flock indicates that she paid thousands of dollars a year in medical bills on plaintiff's behalf between 2000 and 2004. [AR 332-342].

1    In his decision, the ALJ acknowledged Ms. Flock's testimony and provided reasons for not giving

2    it significant weight. [AR 24-25]. The ALJ noted that Ms. Flock's answers "appear to be sincere," but

3    that she had a motive for secondary gain due to her financial support of plaintiff. [AR 24-25]. Standing

4    alone, a claimant's financial motivation for obtaining benefits is not a valid reason for discrediting the

5    testimony of the claimant or family members. See Ratto v. Sec'y, Dep't of Health & Human Srvs., 839

6    F. Supp. 1415, 1428-1429 (D. Or. 1993)("If the desire or expectation of obtaining benefits were by itself

7    sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family)

8    would ever be found credible."). However, an ALJ does not have to ignore evidence suggesting that

9    financial concerns outweigh a sincere belief in the claimant's entitlement to benefits. See Gaddis v.

10   Chater, 76 F.3d 893, 896 (8th Cir. 1996)(agreeing with the ALJ that there was a "strong element of

11   secondary gain in this case," and that the claimant's conduct "belies his sincere belief that he is truly

12   disabled"). The ALJ noted that plaintiff's mother had been plaintiff's sole financial support for a number

13   of years and even bought a condominium for plaintiff to live in. [AR 24-25]. Ms. Flock's testimony that

14   supporting plaintiff financially had become "much too difficult" and something she wished to discontinue

15   was a germane reason for giving her testimony less weight.

16   The ALJ also properly relied on Dr. Malancharuvil's testimony that some of the symptoms

17   described by Ms. Flock, such as argumentativeness, an inability to finish projects, and mood swings, were

18   consistent with plaintiff's documented history of drug and alcohol abuse. [AR 25, 244, 284, 821-822].

19   Because a claimant is prohibited from receiving disability benefits when drug addiction or alcoholism is

20   a contributing factor material to disability, the ALJ legitimately inferred that Ms. Flock's testimony about

21   plaintiff's symptoms was less probative of disability than it might otherwise have been. Accordingly, the

22   ALJ articulated germane reasons for not giving Ms. Flock's testimony great weight.

23   For the foregoing reasons, the ALJ did not err in assessing the value of Ms. Flock's testimony .

24   **Treating therapist's opinion**

25   Plaintiff contends that the ALJ erroneously rejected the opinion of Charles H. Strole, plaintiff's

26   treating marriage and family therapist ("MFT"). [JS 10-12].

27   Evidence from an "acceptable medical source" is required to establish the existence of a "medically

28   determinable impairment," that is, an impairment that can serve as the basis for a finding of severity or

1    disability. See 20 C.F.R. §§ 404.1508, 404.1513(a), 416.908, 416.913(a).  Unlike a licensed physician or

2    psychologist, an MFT is not an "acceptable medical source" whose findings can establish the existence

3    of a medically determinable impairment. A MFT falls into the category of "other sources."  See 20 C.F.R.

4    §§ 404.1513(d), 416.913(d).  The ALJ "may also use" information in the record from "other sources" "to

5    show the severity" (but not the existence) of a claimant's medically determinable impairments and how

6    those impairments affect the ability to work.  20 C.F.R. §§ 404.1513(d), 416.913(d).  The ALJ, however,

7    is not required to give that information the same weight as information from an acceptable medical source.

8    See Gomez v. Chater, 74 F.3d. 967, 970-971 (9th Cir.)(explaining that opinions from "other sources" may

9    be given less weight than those from "acceptable medical sources" under the governing regulations), cert.

10   denied, 519 U.S. 881 (1996).

11           Mr. Strole began treating plaintiff on June 26, 2003. [AR 731].  On July 24, 2003, Mr. Strole

12   referred plaintiff to take the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test.  [AR 726-

13   730].  Mr. Strole diagnosed plaintiff in February 2005 with schizoaffective disorder, somatization

14   disorder, bipolar disorder, borderline personality disorder, antisocial personality disorder, conversion

15   disorder, post traumatic stress disorder, and pain disorder associated with both psychological and general

16   medical condition. [AR 717].  Mr. Strole also assessed plaintiff with a Global Assessment of Function

17   ("GAF") score of 30.[3]

18           The ALJ provided specific, legitimate reasons based on substantial evidence for not accepting Mr.

19   Strole's opinion.  [AR 21-22].  First, the ALJ relied on Dr. Malancharuvil's testimony critiquing Mr.

20

21           [3]    The GAF score is a "multiaxial" assessment that reflects a clinician's subjective judgment
     of a patient's overall level of functioning by asking the clinician to rate two components: the severity
22   of a patient's psychological symptoms, or the patient's psychological, social and occupational
     functioning.  The GAF score is the lower of the symptom severity score or the functioning severity
23   score. A GAF score of 21 through 30 means that delusions or hallucinations considerably influence
     the individual's behavior, a serious impairment in communication or judgment exists (e.g.,
24   sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or the individual is
     unable to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).  See
25   American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth
     Edition ("DSM-IV") Multiaxial Assessment, 27-36 (rev. 2000); see also Vargas v. Lambert, 159
26   F.3d 1161, 1164 (9th Cir. 1998)(describing a GAF score as "rough estimate of an individual's
     psychological, social, and occupational functioning used to reflect the individual's need for
27   treatment").

28

1    Stole's report.  Dr. Malancharuvil said that Mr. Strole's report did not conform to proper diagnostic

2    techniques and revealed "clear lack of knowledge of how to go about diagnosing under any of the axes."[4]

3    [AR 21, 818, 853-855].  For example, Dr. Malancharuvil explained that the diagnosis of post-traumatic

4    stress disorder is an "Axis I" diagnosis.  [AR 717, 853-854].  Mr. Strole, however, placed it under Axis

5    III, which is used for general medical conditions assessed by a physician.  [AR 717, 853-854].  Dr.

6    Malancharuvil also said that Mr. Strole's report was "not trustworthy" because "there are so many

7    diagnos[es] given without any – he has simply used the MMPI and everything that was suggested in the

8    report, possibly hypotheses, he has made it into a diagnosis." [AR 854]. Thus, while Mr. Strole diagnosed

9    schizoaffective disorder, Dr. Malancharuvil testified that "there is absolutely no evidence that this lady

10   is suffering from a psychotic disorder," and that the MMPI-2 results "definitely do[] not support a

11   psychotic disorder." [AR 854].

12         Unlike Mr. Strole, Dr. Malancharuvil was an acceptable medical source whose testimony provided

13   valid grounds for rejecting Mr. Strole's opinion. The ALJ gave other legitimate reasons as well. He noted

14   that Mr. Strole did not indicate whether or not plaintiff continued to use drugs, did not specifically identify

15   functional limitations that prevented plaintiff from working, and acknowledged that plaintiff was

16   noncompliant with treatment. [AR 75].

17         The ALJ did not err in rejecting Mr. Strole's disability opinion in favor of Dr. Malancharuvil's

18   conflicting opinion, which is consistent with the other evidence in the record, including the examining

19   source opinions of Dr. Bedrin and Dr. Jordan.[5]  [See AR 21-22, 24, 26-27, 630-635, 691-695, 800-809,

20         [4]   The DSM-IV uses a "multiaxial assessment" format for identifying mental disorders. "Axis
21   I" is for reporting clinical disorders, while "Axis II" is used to report personality disorders and
     mental retardation. "Axis III" concerns general medical conditions, "Axis IV" is for noting
22   psychosocial and environmental problems, and "Axis IV" is the "Global Assessment of
     Functioning," a summary of the clinician's judgment of the individual's overall level of functioning.
23   DSM-IV, Multiaxial Assessment, 27-36.

24         [5]   Dr. Bedrin diagnosed plaintiff with major depressive disorder, a past history of alcohol
25   abuse, and a past history of drug abuse (amphetamine, cocaine, and cannabis), in remission. He gave
     plaintiff a GAF score of 62, which signifies some mild symptoms, or some difficulty in social,
26   occupational, or school functioning, but which indicates that the subject is generally functioning
     pretty well and has some meaningful interpersonal relationships. DSM-IV, Multiaxial Assessment,
27   27-36.  [AR 634].  Dr. Jordan diagnosed ongoing alcohol and amphetamine abuse, cocaine abuse
     in remission, a polysubstance-induced mood disorder, and amphetamine-induced psychotic .  [AR
28   694]. Dr. Jordan assessed plaintiff with a GAF score of 65, also signifying some mild symptoms

819-823, 851-852]. <u>See</u> <u>Thomas</u>, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record"); <u>Tonapetyan</u>, 242 F.3d at 1148 (explaining opinion of non-examining medical expert may serve as substantial evidence when it is consistent with other independent evidence in the record).

### Severity of plaintiff's mental impairment

Citing Mr. Strole's diagnoses, plaintiff contends that the ALJ erred in finding plaintiff's mental impairment to be nonsevere. [JS 15-16].

"An impairment or combination of impairments may be found not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." <u>Webb v. Barnhart</u>, 433 F.3d 683, 686 (9th Cir. 2006) (internal quotation marks omitted)).To determine whether or not an impairment is severe, the ALJ must determine whether a claimant's impairment or combination of impairments significantly limits his or her physical or mental ability to do "basic work activities."  20 C.F.R. §§ 404.1521 (a), 416.921(a)[6]; <u>see</u> <u>Webb</u>, 433 F.3d at 686-687.

Plaintiff's contention is baseless. The ALJ found that either with or without drug and alcohol use, plaintiff had physical and mental impairments that were, in combination, severe. [AR 20, 25].  He proceeded to evaluate the effects of plaintiff's severe physical and mental impairments at steps three through five of the sequential evaluation procedure. The ALJ found plaintiff disabled by her physical and mental impairment when she was using drugs and alcohol, but not disabled if she stopped using those substances. [AR 20-27].

If plaintiff is suggesting that the ALJ erred in failing to find severe all of the conditions diagnosed by Mr. Strole, that argument also lacks merit.  For the reasons described above, the ALJ  did not err in rejecting Mr. Strole's opinion. Furthermore, the mere diagnosis of a disorder, without more, is not

---

or some difficulty in functioning.  [AR 634].

[6]     Basic work activities are the "abilities and aptitudes necessary to do most jobs," such as (1) physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling; (2) the capacity for seeing, hearing, speaking, understanding, carrying out, and remembering simple instructions; (3) the use of judgment; and (4) the ability to respond appropriately to supervision, co-workers, and usual work situations.  20 C.F.R. §§ 404.1521(b), 416.921(b).

sufficient to show the existence of a severe impairment. See Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997) (noting that although step two "requires a 'de minimis' showing of impairment," a claimant "must show more than the mere presence of a condition or ailment") (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)).

### Complete hypothetical question

Plaintiff contends that the ALJ failed to pose a hypothetical question to the vocational expert that set out all of plaintiff's particular limitations and restrictions, "including her limitations to simple one-two step instructions . . . ." [JS 18 (citing AR 857)].

The ALJ's job at the fifth step in the sequential evaluation procedure is to pose hypothetical questions that set out all of the claimant's impairments for the consideration of the vocational expert, who then "translates these factual scenarios into realistic job market probabilities . . . ." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). Hypothetical questions posed to the vocational expert must accurately describe all of the limitations and restrictions of the claimant that are supported by substantial evidence in the record. Robbins, 466 F.3d at 886; Tackett, 180 F.3d at 1101. The ALJ "is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." Greger v. Barnhart, 464 F.3d 968, 973 (9th Cir. 2006)(quoting Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001)).

Plaintiff challenges the sufficiency of a hypothetical question posed by the ALJ to vocational expert Sandra Fioretti during the March 2005 hearing. [JS 18; AR 857]. The ALJ's final decision, however, does not rely on Ms. Fioretti's testimony in response to that question. In his March 2007 decision, the ALJ relied on testimony given by vocational expert Corinne Porter during the January 2007 hearing in response to a different hypothetical question. [AR 26-27, 800-804]. The limitations that were included in that hypothetical question were those ultimately included in the ALJ's RFC finding. [AR 801-802]. Ms. Porter testified that the hypothetical person described by the ALJ could not perform plaintiff's past relevant work, but that such a person could perform the unskilled job of an electronics worker, numbering 1,500 positions locally and 10,000 nationally. [AR 803].

For the reasons explained above, substantial evidence supports the ALJ's RFC determination, including his finding that plaintiff could perform a narrowed range of light work requiring "simple, repetitive tasks consisting of 3-4 step instructions." The ALJ did not err in relying on the vocational

1  expert's testimony in response to a hypothetical question setting forth those limitations.

2  **Conclusion**

3  The Commissioner's decision is supported by substantial evidence and is free of legal error.

4  Accordingly, the Commissioner's decision is **affirmed**.

5  **IT IS SO ORDERED.**

6  DATED:  July 8, 2009

7

8  _____
   ANDREW J. WISTRICH
   United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28